IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12–cv–02400–REB–KMT

SHANE JOHNSON,

    Plaintiff,

v.

JUSTIN DASH, individual and official capacity as case manager,
JAMES OLSON, individual and official capacity as committee chairperson,
CARMEN ESTRADA, individual and official capacity as committee chairperson, and
KATHLEEN BOYD, individual and official capacity as nurse practitioner,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Magistrate Judge Kathleen M. Tafoya

    This case comes before the court on Defendant Boyd's "Motion for Summary Judgment" (Doc. No. 179 [Boyd's Mot.]) and the CDOC Defendants "Motion for Summary Judgment" (Doc. No. 180 [CDOC's Mot.]), both filed June 19, 2015.  Plaintiff filed a "Response to Both of Defendant's [sic] Motions for Summary Judgment" on July 13, 2015 (Doc. No. 187 [Pl.'s Resp.]), and the defendants filed their replies on July 24, 2015 (Doc. No. 191 [CDOC's Reply]; Doc. No. 193 [Boyd's Reply]).

    Also before the court is Plaintiff's "Third Motion for Summary Judgment" (Doc. No. 170 [Pl.'s Mot.], filed June 5, 2015), to which Defendants Dash, Olson, and Estrada ("the CDOC Defendants") filed their response on June 29, 2015 (Doc. No. 184 [CDOC Defs.' Resp.]),

Defendant Boyd filed his response on June 29, 2015 (Doc. No. 185 [Boyd's Resp.]), and Plaintiff filed his reply on July 27, 2015 (Doc. No. 194 [Pl.'s Reply]).

## STATEMENT OF THE CASE

Plaintiff is a *pro se* inmate who alleges that his due process rights to meaningful reviews of his continued placement in administrative segregation were violated by Defendants Dash, Olson, and Estrada. (*See* Doc. No. 93 [Am. Compl.], Claim Three.) Plaintiff also alleges he was not provided with adequate medical care by Defendant Boyd in violation of his Eighth Amendment rights. (*See id.*, Claim Two.) All other claims have been dismissed. (Doc. No. 147 [Order Adopting Recommendation of U.S. Magistrate Judge] at 5-6.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d

664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

*1.  Defendant Boyd's Motion*

The only remaining claim against Defendant Boyd is Plaintiff's Claim Two, alleging violations of his Eighth Amendment rights.  (*See* Am. Compl. at 5-10.)  Defendant Boyd argues Plaintiff fails to state an Eighth Amendment claim against Defendant Boyd.  (See Boyd's Mot.)

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of his federal rights against a person acting under color of state law.  *See* 42 U.S.C. § 1983; *see also West v. Atkins*, 487 U.S. 42, 48 (1988).  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).  "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from bodily harm."  *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citation omitted).  The Eighth Amendment also prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Prison officials may be liable for an Eighth Amendment violation for "indifference . . . manifested . . . in their response to the prisoner's needs or by . . . intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed."  *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014).

"The test for constitutional liability of prison officials involves both an objective and a subjective component."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and

citation omitted). First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. 825, 834 (1994)). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (holding that even a physician's grossly negligent medical judgment is not subject to scrutiny if the prisoner's need for medical treatment was not obvious) (internal quotations and citation omitted). Furthermore, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir.2001) (quotations and citation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted). Second, under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted).

      Defendant Boyd construes Plaintiff's Eighth Amendment claim as one for delayed treatment of medical care. (See Boyd's Mot. at 16; Boyd's Reply at 3.) Plaintiff agrees that "the gravamen of [his] contention" is for a delay of medical treatment, specifically preliminary lab testing, pain treatment, and a physical exam. (Pl.'s Resp. at 5.) In situations where treatment has been delayed rather than denied altogether, the Tenth Circuit Court of Appeals requires that the

inmate show "substantial harm" as a result of the delay. *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). Substantial harm includes "lifelong handicap, permanent loss, or considerable pain." *Garrett*, 254 F.3d at 950.

Defendant Boyd presents expert evidence that there was no substantial harm in any delay of treatment. She submits an affidavit from Susan M. Tiona, M.D., Chief Medical Officer for the CDOC, who summarizes Plaintiff's medical care (and attaches copies of reports from Plaintiff's medical file) and provides detailed information about Hepatitis C Virus ("HCV") and the CDOC's HCV Clinical Standard. (CDOC Defs.' Mot., Ex. A-1.) This undisputed evidence demonstrates that plaintiff did not suffer substantial harm as a result of any delay in medical treatment.

As shown by Defendant Boyd, Plaintiff presented to the Denver Reception and Diagnostic Center on about January 13, 2011. (*Id.*, ¶ 36.) It was noted that Plaintiff had the Hepatitis C virus and had known about his infection since at least 2000. (*Id.*, ¶ 37.) On September 26, 2011, Plaintiff was seen by Defendant Boyd in response to a kite that he had written requesting evaluation for Hepatitis C. (*Id.*, ¶ 43.) Defendant Boyd advised Plaintiff of the requirement for six months of Drug and Alcohol ("D&A") classes prior to being submitted for consideration of treatment for his Hepatitis C infection, which was consistent with the CDOC Clinical Standard for Hepatitis C in 2009. (*Id.*, ¶ 44.) At that time, Plaintiff's clinical presentation (including labs and physical presentation) showed that he was very stable in regards to his infection, with only minimal elevation in his liver tests, and no other lab or exam abnormalities. (*Id.*, ¶ 45.)

Plaintiff started his required D&A class on September 29, 2011, at Colorado State Penitentiary ("CSP"). (*Id.*, ¶ 46.) Sometime between June 12, 2012, and June 19, 2012, the

certificate of completion for Plaintiff's D&A classes was submitted for the medical chart. (*Id.*, ¶ 52.) On December 12, 2012, after all of the Hepatitis C pre-treatment evaluation components were satisfied, Plaintiff was eligible to be referred to the Infectious Disease Committee for consideration of Hepatitis C treatment. (*Id.*, ¶¶ 60-61.) On December 21, 2012, Plaintiff's Hepatitis Evaluation Worksheet was faxed to the DOC Infectious Disease Committee ("IDC") for consideration. (*Id.*, ¶ 62.) After approval by the IDC, Plaintiff's Hepatitis C treatment began in April 2013. (*Id.*, ¶¶ 63, 65.)

In September 2013, Plaintiff completed treatment for Hepatitis C with relatively few intra-treatment complications. (*Id.*, ¶ 68.) In November 2013, Plaintiff had a negative viral load test for Hepatitis C, and in June 2014, Plaintiff again had a negative viral load test for Hepatitis C. (*Id.*, ¶¶ 69-70.) Upon Dr. Tiona's review of the records, she opines Plaintiff has not and will not suffer a permanent disability or lifelong hardship as a result of the timing of his Hepatitis C treatment. (*Id.*, ¶ 66.)

In his response, it appears Plaintiff contends he has liver cirrhosis as a result of the alleged delays in treating his Hepatitis C. (*See* Pl.'s Resp. at 1-5.) Plaintiff provides no evidence for this contention. To the contrary, the medical evidence shows that Plaintiff did not sustain cirrhosis of the liver, nor any measurable liver damage. For example, Plaintiff asserts that several of his laboratory results yielded elevated results in certain categories, which shows that he sustained cirrhosis or liver damage. (Pl.'s Resp. at 2.) However, Dr. Tiona explains in her Affidavit that Plaintiff's Hepatitis C and the impact on his liver was being monitored since his arrival in the CDOC, and though some of the test results were elevated, his test results showed only mildly

7

elevated results in some categories, and overall, his test results were "unremarkable" from a medical standpoint. (*See* Boyd's Mot., Ex. A-1 at 6-7, ¶¶ 40-41, 45; Boyd's Reply, Ex. A-3, ¶¶ 6-15.)

Plaintiff also identifies personal characteristics, such as his gender, age, and history of alcohol use, that are risk factors for developing liver cirrhosis. (Pl.'s Resp. at 2.) However, the uncontroverted evidence shows that despite these risk factors, Plaintiff never actually developed liver cirrhosis, nor any measurable decompensation of his liver. (Boyd's Reply, Ex. A-3, ¶ 15.) Plaintiff also contends that the results of several of the routine tests that he underwent concerning his "ALT levels," "Prothrombin Time," "Albumin," and "Platelets," yielded results that were elevated. (Pl.'s Resp, at 2-3.) However, in her supplemental affidavit, Dr. Tiona explains the results were only minimally elevated, were unremarkable, and did not indicate that he had suffered liver damage. (*See* Boyd's Mot., Ex. A-1 at 6-7, ¶¶ 40-41, 45; Boyd's Reply, Ex. A-3, ¶¶ 6-15.)

Plaintiff also attaches to his response the Initial Screening Information Sheet for Hepatitis C treatment as evidence for his assertion that he sustained liver damage. (Pl.'s Resp. at 13.) Contrary to Plaintiff's assertion, however, the Information Sheet shows that Plaintiff did not have any appreciable liver damage or cirrhosis. Rather, the Information Sheet contained a category for the medical care provider who filled out the sheet to check "yes" or "no" as to whether there was evidence that Plaintiff's liver had decompensated or whether there was clinical evidence of liver cirrhosis. (*Id.*) The form was marked "no."[1] (*Id.*)

---

[1] It appears that the box was initially marked "yes," and then crossed out and corrected to reflect "no." Dr. Tiona opines that, had there been clinical evidence that Plaintiff's liver was

Plaintiff also contends the delay in treatment caused him to lose approximately 41 pounds. (Pl.'s Resp. at 13.) The medical records Plaintiff relies on for this contention show his weight varying between 247 pounds and 206 pounds. (Doc. No. 129 at 31-33.) Weight loss alone does not establish that Plaintiff's Eighth Amendment rights were violated, where there is no evidence that it compromised his health or that the weight loss was caused by the alleged delay in Hepatitis C treatment. *See Clement v. Cal. Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1106 (N.D. Cal. 2002) ("The fact that Plaintiff lost fourteen pounds while awaiting surgery is not a sufficient showing of harm because, after an initial period of weight loss, Plaintiff's weight stabilized. Moreover, Plaintiff has not presented evidence linking his weight loss to the delay in receiving the colonoscopy."). Here, Dr. Tiona opines Plaintiff has not and will not suffer a permanent disability of lifelong hardship as a result of the timing of his Hepatitis C treatment. (Boyd's Mot., Ex. A-1, ¶ 66.) Plaintiff has failed to provide evidence that his weight fluctuations are related to any delay in his receiving Hepatitis C treatment.

Finally, Plaintiff contends that he was and is in considerable pain due to the delay in medical treatment. Substantial harm may be shown by proof that "considerable pain" resulted from a delay in medical care. *Garrett*, 254 F.3d at 950. However, in support of his contention that he was in pain, Plaintiff refers only to one kite in which he complains about chronic pain, specifically in his knee, shoulders, and hips. (Doc. No. 129 at 18.) Defendant Boyd argues that the evidence does not show that Plaintiff had an objective need for treatment for pain. (Boyd's

---

decompensated or that he had cirrhosis, he would not have qualified to receive the Hepatitis C treatment that he was given. (Boyd's Mot., Ex. A-1, ¶ 22.)

Reply at 5.)   Upon a review of the medical records provided by Defendant, the only reference to Plaintiff being in any pain is on a March 15, 2012, visit to a dentist, during which he had two teeth removed.  (*See* Boyd's Mot., Ex. A-1 at 32.)   Moreover, in her supplemental affidavit, Dr. Tiona explains that a chronic Hepatitis C infection does not, by itself, cause pain or other such physical symptoms.  (Boyd's Reply, Ex. A-3, ¶ 16.)   Dr. Tiona explains pain may be associated with a Hepatitis C infection when Hepatitis C has led to advanced liver failure (*id.*, ¶ 17); however, Plaintiff does not have advanced liver failure or any appreciable decompensation of his liver. (*Id.*, ¶ 18.)   As explained by Dr. Tiona, Plaintiff's health was being monitored since his arrival at the CDOC, and given the status of Plaintiff's Hepatitis C in 2011 and 2012, there was no physiological reason for Plaintiff to have symptoms such as severe daily pain, a condition that is not evidenced in the medical records.  (*Id.*, ¶¶ 5-10.)   Because Plaintiff's contentions regarding his claims of pain are "blatantly contradicted by the record," the court should not adopt his version of the facts for purposes of ruling on Defendant Boyd's motion for summary judgment.  *Scott*, 550 U.S. at 380.

   Plaintiff fails to show "substantial harm" as a result of any delay in treatment.  *Garrett*, 254 F.3d at 950.   There is no dispute as to the material facts contained in Plaintiff's medical records; thus, the burden rests on Plaintiff to present evidence that would create a triable issue of fact.  *Concrete Works*, 36 F.3d at 1518.   Plaintiff fails to meet that burden.   Accordingly, Defendant Boyd's motion properly is granted.

*2.     CDOC's Motion*

The only remaining claim against the CDOC Defendants is Plaintiff's Claim One, alleging their failure to provide meaningful reviews of his confinement in administrative segregation after April 2, 2012. (*See* Am. Compl., ¶ 9; Order Adopting Recommendation of U.S. Magistrate Judge at 6, ¶ 3.a.) The CDOC Defendants argue that Plaintiff fails to state a viable due process claim against them. (*See* CDOC's Mot.)

*A.     Defendants Estrada and Olson*

The CDOC Defendants argue, in part, that Defendant Estrada did not personally participate in the monthly reviews of Plaintiff's classification in administrative segregation while he was at Centennial Correctional Facility ("CCF") and that Defendant Olson did not personally participate in the monthly reviews of Plaintiff's classification in administrative segregation while he was at CSP. (CDOC Defs.' Mot. at 19, 22.) Personal participation is an essential element of a § 1983 civil rights action. *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir.1976). To establish personal liability, a plaintiff must show that the official caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). In other words, "for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006).

Moreover, a defendant may not be held liable merely because of his or her supervisory position. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996). Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. *Escobar v. Reid*, 668 F.Supp.2d 1260, 1290 (D.Colo.2009) (" respondeat superior is not within the purview of § 1983"). "There is no concept of strict supervisor liability under § 1983." *Serna v. Color. Dep't of Corrs.*, 455 F.3d 1146, 1151-52 (10th Cir. 2006). "Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." *Id.*

Defendant Estrada submits an affidavit in which she states she was a Case Manager III at CCF, where Plaintiff was incarcerated from February 16, 2012, to June 29, 2012. (Mot., Ex. A-1, ¶¶ 2, 5.) As Case Manager III, Defendant Estrada's duties and responsibilities included supervising case managers, reviewing classification forms, and serving as a member of Internal Classification Committee. (*Id.*, ¶ 3.) Defendant Estrada did not have a case load of offenders. (*Id.*, ¶ 6.) Rather, as a Case Manager III, and as part of her role as the classification committee chairperson, Defendant Estrada reviewed the classification review forms for accuracy and signed the monthly review forms, along with the case manager who prepared the form and the additional case manager on the classification committee. (*Id.*, ¶ 35.) In this case, Defendant Estrada reviewed and signed three classification review forms dated April 9, May 9, and June 8, 2012. (*See* CDOC's Mot., Ex. A-1 at 45-47.)

Defendant Olson also submits an affidavit in which he states he also was a Case Manager IIII at CSP, where Plaintiff was incarcerated from June 29, 2012, to September 14, 2012. (*Id.*, Ex.

12

A-2, ¶¶ 5-6.)  Defendant Olson had the same responsibilities as Defendant Estrada—supervising other case managers but having no case load of offenders.  (*Id.*, ¶ 6.)  Defendant Olson explains that, in congruence with CDOC Administrative Regulation ("AR") 650-03, Plaintiff's case manager would have had monthly face-to-face meetings with Plaintiff to discuss various issues, including his progression through the administrative segregation level system.  (*Id.*, ¶ 14; *see* Ex. A-1 [AR 650-03] at 48-64.)  However, because Defendant was not Plaintiff's case manager, it was not within Defendant Olson's job responsibilities to hold monthly face-to-face meetings with offenders.  (*Id.*, Ex. A-2, ¶ 15; Ex. A-1 at 54.)

Plaintiff disputes Defendants Estrada and Olson's assertions that they were not involved in the review of Plaintiff's administrative segregation placement, responding that Defendants Estrada and Olson "did have an inmate case load and particularly with the role of 'committee member' on my ASR's, where they checked for accuracy and based on the info therein contained, voted to retain me at a certain level of Ad Seg and signed it."  (Pl.'s Resp. at 6.)  Nevertheless, the court agrees with Defendants Estrada and Olson that their involvement in Plaintiff's due process claim was limited to their supervisory roles as Case Manager III.  The court finds Defendants Estrada and Olson have met their initial burden of showing an absence of evidence to support Plaintiff's case.  *Celotex Corp.*, 477 U.S. at 325.  On the other hand, Plaintiff has failed to present evidence to meet his burden to demonstrate a genuine issue for trial in this regard.  *Concrete Works*, 36 F.3d at 1518.  Thus, Defendants Estrada and Olson are entitled to summary judgment as to Plaintiff's due process claim.  *See Larson v. Meek*, No. 04-1169, 2007 WL 1705086, at *3 (10th Cir. June 14, 2007) ("Mr. Gillespie's denial of the grievances alone is insufficient to establish

personal participation in the alleged constitutional violations."); *Garcia v. Furlong*, No. 94-1477, 1996 WL 128130, at *3 (10th Cir. Mar. 22, 1996) (where supervisory defendant's only alleged actions were to administratively affirm the imposition of disciplinary punishment concerning inmate plaintiff, district court's dismissal of § 1983 action against supervisory defendant based on lack of personal participation was affirmed); *Howell v. Koch*, No. 95-1263, 1995 WL 649776, at *4 (10th Cir. Oct. 30, 1995) (dismissal of supervisory prison and state correctional officials affirmed where officials were sued solely on basis of their supervisory positions and inmate plaintiff failed to allege their personal participation in the medical diagnosis and treatment about which he complained).

### B.     *Defendant Dash*

The CDOC Defendants also argue that Defendant Dash provided Plaintiff with sufficiently meaningful reviews of his administrative segregation placement. (CDOC's Mot. at 21.)

The Tenth Circuit addressed the standards for placement in administrative segregation in *Toevs v. Reid*, 685 F.3d 903, 907, 911-915 (10th Cir. 2012). In *Toevs*, after a panel re-hearing of an earlier decision, 646 F.3d 752 (10th Cir.2011), the Tenth Circuit considered whether the same program at issue here—the QLLP—provided meaningful periodic reviews.[2] Mr. Toevs was placed in administrative segregation after attempting to escape. 685 F.3d 903 at 908. Mr. Toevs

---

[2] Prior to May 15, 2012, administrative segregation was governed by a quality of life program set forth by CDOC Administrative Regulation (AR) 600-02, effective date December 2, 2010. (CDOC's Mot., Ex. A-1, ¶¶ 19-20.) Under the version of AR 650-03 in effect as of May 12, 2012, the former Quality of Life system had been replaced with a progressive management process that included four distinct Privilege Levels. (*Id.*, ¶ 52.)

complained that he was denied due process because the periodic reviews he received "were perfunctory, meaningless, and all said the same thing." *Id.*

The Tenth Circuit noted that, unlike punitive segregation, "administrative segregation is not punitive and it looks to the present and future rather than to the past." *Id.* at 913. Thus, in the context of a behavior-modification program like the QLLP, a "meaningful" review "evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to segregation, determines, without preconception, whether that placement remains warranted." *Id.* A meaningful review "would consider whether the prisoner is eligible to move to the next level or, if the prisoner is at the highest level, if he or she is eligible to graduate from the program." *Id.* It should "provide a statement of reasons, which will often serve as a guide for future behavior (i.e. by giving the prisoner some idea of how he might progress toward a more favorable placement)," because the goal of placement in a stratified incentive program "is solely and exclusively to encourage a prisoner to improve his future behavior." *Id.*

The Tenth Circuit panel held that Mr. Toevs had not received meaningful periodic reviews of his placement in administrative segregation. *Id.* at 914-915. For example, he was not given meaningful information as to why he was being held at a certain level. *Id.* Specific classes were recommended, but there was no indication whether they had to be completed in order to progress to a higher level. *Id.*

It is undisputed that Plaintiff was at CSP for three and one half months. (CDOC's Mot., Ex. A-3, ¶ 7.) Defendant Dash was a case manager for Plaintiff while he was incarcerated at CSP. (*Id.*) Plaintiff was at Level 3 at the time he came on to Defendant Dash's case load on June 29,

2012. (*Id.*, ¶ 15.) Defendant Dash avers that he provided Plaintiff with sufficiently meaningful reviews of his placement, and, in fact, progressed Plaintiff to the next level during the brief three and a half months in which he had contact with him at CSP. (*See id.*, ¶¶ 15, 31-36.) Defendant Dash, under the AR that went into effect May 15, 2012, pursuant to the *Toevs* case, provided Plaintiff with written review forms, and he had a personal meeting with Plaintiff in which they discussed Plaintiff's progression from Level Three to Level Four within just a few weeks of Plaintiff's arrival at CSP, and during which Defendant Dash explained to Plaintiff what he needed to do in order to progress. (*Id.* at ¶¶ 15-27.) Defendant Dash presented Plaintiff for progression to the next level on August 2, 2012, which was within approximately one month after Plaintiff was placed on Defendant Dash's caseload on June 29, 2012, and approximately three weeks after their meeting on July 11, 2012; subsequently Defendant Dash informed Plaintiff of the progression and reminded him of the need to continue with positive behaviors and avoid negative chrons. (*Id.*, ¶¶ 29-32, 36.) On September 5, 2012, Defendant Dash had a face-to-face meeting with Plaintiff in which he informed Plaintiff that he was being progressed from Level 3 to Level 4(B). (*Id.*, ¶ 36.) Defendant Dash did not discuss Plaintiff's next progression with him at that meeting, because Plaintiff had just been approved to progress to the next level and was going to be transferred to the Sterling Correctional Facility ("SCF") for Level 4(B). (*Id.*, ¶ 37.) Plaintiff was transferred to SCF on September 14, 2012, nine days later. (*Id.*, ¶ 38.)

Plaintiff does not dispute any of Defendant Dash's assertions and does not dispute that he conducted personal meetings with Plaintiff. Rather, Plaintiff argues that "Defendant Dash never informed me, in person or otherwise, of 'the reasons why I was being recommended for or denied

progression.' " (Pl.'s Resp. at 7.) Even accepting this allegation as true, the undisputed evidence is that the reviews conducted by Plaintiff during the face-to-face meetings largely complied with the requirements of *Toevs*. 685 F.3d 903 at 908. Moreover, the court agrees that, if Defendant had not conducted meaningful reviews, Plaintiff would not have progressed from Level 3 to Level 4 during the short period he was incarcerated at CSP. The evidence is clear that Defendant Dash did not deny progression to Plaintiff; as such, there was no obligation to notify Plaintiff of any denial. The undisputed facts simply do not establish that Defendant Dash failed to provide Plaintiff with meaningful reviews.

Accordingly, Defendant Dash is entitled to summary judgment on Plaintiff's due process claim.

### 3. *Qualified Immunity*

All of the defendants, in their individual capacities, raise the defense of qualified immunity to Plaintiff's claims. Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). To overcome the defendants' claim of qualified immunity, the plaintiff must establish that the defendants' actions violated plaintiff's constitutional or statutory right and that the right at issue was clearly established at the time of the defendants' alleged unlawful conduct. *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). "[C]ourts have discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry.

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks and citations omitted).

This court has recommended that summary judgment be granted in favor of all of the defendants; thus Plaintiff has not established that the defendants violated Plaintiff's constitutional or statutory rights.   The defendants are entitled to qualified immunity in their individual capacities.

### *4.     Plaintiff's Motion for Summary Judgment*

Plaintiff's motion for summary judgment is for the most part a recitation of the arguments and facts made in response to Defendants' motion for summary judgment.   The arguments and recitations do not add to or change the analysis of Plaintiff's claims.   Plaintiff's motion raises no genuine dispute as to any material fact.   Fed. R. Civ. P. 56(a).   Therefore, Plaintiff's motion for summary judgment properly is denied.

**WHEREFORE**, for the foregoing reasons, the court respectfully

**RECOMMENDS** that

1.     Defendant Boyd's "Motion for Summary Judgment" (Doc. No. 179) be **GRANTED**;

2.     The CDOC Defendants "Motion for Summary Judgment" (Doc. No. 180) be **GRANTED**; and

3.     Plaintiff's "Third Motion for Summary Judgment" (Doc. No.170) be **DENIED**.

**ADVISEMENT TO THE PARTIES**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those

portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 20th day of August, 2015.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge